## IN THE MATTER OF CHARLES D. KIRK.

### Argued June 12, 1925—Decided October 3, 1925.

1. A town hall, where public business is transacted, is a public place within the meaning of section 3 of "An act concerning disorderly persons."
2. When defendant publicly charged a member of council, in a public place, with being a "bootlegger," he, in legal effect, charged him with being a criminal, and thereby used offensive language in a public place under the provisions of section 3 of the Disorderly act.

On review of defendant's conviction for disorderly conduct in the recorder's court of Weehawken.

Before Mr. Justice MINTURN.

For the defendant, *William B. Stites*.

For the township, *William S. Stuhr*.

The opinion of the court was delivered by

MINTURN, J. The observant traveler, leaving the dizzy cliffs of Manhattan in his progress up the Rhine of America, will inevitably have obtruded upon his expectant vision the bold outlines of a precipitous cliff of basaltic rock of glacial origin, which, Gibraltar like, projects its giant outlines into the rolling waters of the majestic Hudson, guarding, as it were, the erstwhile fancied entrance of the visionary pioneer to the fabulous wealth of the Indies.

Inquiry will elicit the information that this monumental projection was intended by a natural prehistoric cataclysm to mark the gateway to the famous Palisades, and that stretched at its feet in bucolic simplicity are the remnants of the beautiful emerald slopes termed by the primeval natives "awiehawk," and by the modern residents "Weehawken." Of these scenes the poet Fitz Greene Halleck, in ravishing transport, wrote:

"When life is old, and many a scene forgot,
 The heart will hold its memory of this."

Upon these arboreal slopes, the traveler will be told, was enacted one of the greatest tragedies in American history, for there the scintillating Burr, in the days of the duel, took from human existence the erudite and heroic Hamilton, and to that extent sadly impoverished American public life.

Although a century of national existence has passed, no stately monument graces the site of that national tragedy, but, hidden away out of the vision of public observation, there has been erected by some public-spirited hand an attenuated enclosure that might be visualized as an adequate conception of Ibsen's "Doll House," which contains a miniature carving of what we are informed in apologetic tones is intended to serve as a bust of the lamented Hamilton. But, like all modern self-concentrated townships, this municipality shares the unique distinction peculiar to the dress of modern modish femininity, that it possesses neither distinctive bodily lines nor perceptible corporeal boundaries, so that the anxious traveler, intent upon seeking its historic landmarks, is unable, without expert assistance, to determine its terminus *a quo* or its terminus *ad quem*.

However, like all townships worthy of the name, it prides itself upon the possession of a town hall, which, like the Acropolis at Athens or the Forum at Rome is the *Deus ex machina* for all municipal lucubration, the fount of all public inspiration and the mecca of all political ambition.

It also enjoys the spiritual distinction of the early church, in that it is built upon a rock, from which *adamantine tenure* neither the inconoclastic hand of time nor the progressive evolutionary arguments of municipal ambition have been able to dislodge it, but enshrouded in an atmosphere of modern mysticism, retirement and modesty, it stands like the rock of ages, unmoved and immovable.

Upon stated evenings, amid the quietude of an environment which makes for serious reflection and dignified procedure, the business of the township was transacted without ostentation, and yet with becoming dignity, decorum and dispatch,

until the memorable night of June 3d, 1925, when, in the quietude of their homes, the confiding inhabitants were startled, astounded, humiliated and shocked to learn that one of their honored representatives, in the solemn conclave of a public session, had been called a "bootlegger" and a "souphead." Such a flagrant contempt of the dignity of the town and its representatives was properly met by a proceeding under section 3 of the Disorderly act against this defendant, and, in due time, he was found guilty before the recorder, and sentenced to imprisonment, which, however, like the sword of Damocles, is hanging over him, while he behaves himself within the unobservable and indistinguishable limits of the township.

The defendant, upon this review, insists that if there be such an offense as is charged against him, it was not committed in a public place. This contention is certainly unique, for if any place be public the hall erected by the public for the transaction of public business, like a public park, is peculiarly within that designation. *State* v. *Lynch*. 23 *N. J. L. J.* 45; *State* v. *Gross,* 96 *N. J. L.* 401.

But his strenuous contention is, and this connotes serious pause and no little bewilderment, that his utterances were terms of compliment and distinction rather than offensive epithets, so as to be comprehended within the term disorderly conduct. Thus, it is argued that while the bootlegger, like some of the early saints, may have had an unholy beginning, he has risen like the Phoenix, and stands today as the chivalric Bayard, *sans peur et sans roproche,* the cynosure of every eye, and the hope of every heart wherever liberty unrestrained possesses an admirer, and license unchallenged commands a champion. In various social circles, where bibulousness is ever the dominant thought, and the proverbial hip-pocket is seldom a vacuity, is he not recognized like Robespierre as the saviour of popular liberty?

In financial and business circles does he not command extensive credit when the ordinary purveyor of dry goods receives scant accommodation? Does he not boast of his estates and acquisitions, when the ordinary laborer in the vineyard

struggles like Sisyphus to maintain his never decreasing burden? Does not the government, in recognition of his potentiality and prowess, spend princely sums to padlock him on land and suppress his activities upon the raging main? Like the Publican, does he not often occupy a prominent pew in our temples of worship, and are not the faithful publicly exhorted to pray for his deliverance from the bondage and prosecutions of the merciless minions of the law? Surely, to quote Holy Writ, "by their fruits ye shall know them." But, with all its plausibility and force, this alluring picture of modern success and godliness presents another side. Reared above it all, like the condemning hand which consigned the Babylonian to disaster and oblivion, is the handwriting of the constitution and the law, which condemns this unique malefactor as a criminal, and consigns him to the same moral and legal category as the pirate and the outlaw.

No financial, social or religious recognition can remove the brand of Cain from the brow, or place a heroic halo upon the head of one who stands as a common felon before the law. When, therefore, this defendant publicly charged a member of the council, in a public place, with being a bootlegger, he charged him, in legal effect, with being a criminal, and thereby subjected himself to the charge leveled against him in this complaint.

The mystical term "souphead," however, stands in another category, and awakens delectable memories of the early well-kept home, fast disappearing, like many other cherished American institutions, before the tinsel invasion of that bird-like roost, appropriately termed a flat. This euphonious appellation seems to have had a local application peculiar to days when that attractive dish was made and consumed with relish and avidity by the habitues of that ancient comfort station known as a bar room.

The libraries and lexicons of neighboring municipalities furnish no clue to its origin, doubtless due to the fact that in those less-favored localities the canned variety fulfilled the local needs. Nor are we in anywise assisted in this research by the erudite researches of learned counsel, possessed as they

are with a large and varied experience in the sociological conditions of the past. The difficulty of classification and etymology is therefore quite manifest, and, as in all such researches when modern learning fails, recourse must be had to the ancient founts of inspiration. The antique genus "souphead" was doubtless the proud possessor of a mentality surcharged, among other things, with the diluted essence of succulent garden products, not radically distinguishable from the modern vegetarian, whose dietary code has its genesis in soup as a fundamental substratum.

Magnum Caput, of the luxurious Roman, was possessed by a character *sui generis*—a product of the rich Etruscan vineyards, not unlike the over-stimulated graduate of the embossed bar room of later times, and subjected its possessor alternately to pity, ribaldry and ridicule, but in no proper sense could this proud product of inebriety be classed as a "souphead."

When soup houses existed as a social safety valve, assuming the status in modern life occupied by the Roman *Panem et circenses,* the master mind controlling the institution might well be termed a "souphead." So, also, it may be accepted as a matter of judicial observation, that during the lightening-like rapidity with which some modern trials and arguments are conducted, judges and lawyers alike, with equal rapidity, betake themselves to the nearest boniface, and there discard everything edible for this attractive and toothsome decoction, as though to evince that in some esoteric manner the rapid administration of the work typified by the blindfolded goddess, is dependent upon the momentary acquisition and rapid digestion of that everready and most inviting dietetic staple.

If, therefore, we apply the legal maxim *noscitur a sociis* to the situation, the "souphead" maintains respectable and satisfactory relationships in all the dignified walks of life, and, proverbially, one is known by the company he keeps.

In the light of these circumstances it will be quite universally conceded that the head which invented this popular gastronomic edible, like the genius who discovered the attrac-

tion of gravitation, or the rotundity of the earth, is entitled to the applause and gratitude, rather than the condemnation of mankind.

Obviously, therefore, the term cannot be deemed either undignified or offensive, and the defendant, whether conscious of his complimentary ebullition or not cannot be adjudged guilty of disorderly conduct.

The conviction, however, must be sustained upon the ground first stated.